No. 88,046

STATE OF KANSAS, *Appellee,* v. JUAN PABLO MARTINEZ, *Appellant.*

(78 P.3d 769)

Opinion filed October 31, 2003.

*Shawn Minihan*, assistant appellate defender, and *Randall L. Hodgkinson*, deputy appellate defender, were on the brief for appellant.

*Lois K. Malin*, assistant county attorney, argued the cause, and *John P. Wheeler, Jr.*, county attorney, and *Carla J. Stovall*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

GERNON, J.: In this criminal appeal, Juan Pablo Martinez challenges the constitutionality of the Kansas statute which requires an individual to provide blood and saliva samples for a DNA database after a conviction of burglary. We affirm.

Martinez was charged with one count each of felony aggravated burglary and misdemeanor theft. Martinez entered an *Alford* plea to one count of burglary pursuant to K.S.A. 21-3715. The district court sentenced Martinez to 24 months' probation and required him to provide blood and saliva samples for the DNA database in accordance with K.S.A. 2001 Supp. 21-2511. Martinez appeals from the court's order requiring him to provide blood and saliva samples for the DNA database. The case was transferred to the Supreme Court pursuant to K.S.A. 20-3018(c).

Martinez argues that forcing him to provide blood and saliva samples pursuant to K.S.A. 2001 Supp. 21-2511 is a violation of his Fourth Amendment rights because a DNA sample is not reasonably related to the crime of burglary. Martinez argues that K.S.A. 2001 Supp. 21-2511 is unconstitutional because it was amended to include burglary. Martinez argues that burglary does not involve DNA evidence like sex crimes and other violent crimes.

We recently addressed the constitutionality of K.S.A. 2001 Supp. 21-2511 as it applies to the crime of burglary in *State v. Maass*, 275 Kan. 328, 64 P.3d 382 (2003). In *Maass*, 275 Kan. at 337, we

upheld the statute applying the balancing test as set forth in *Jones v. Murray*, 962 F.2d 302 (4th Cir.), *cert. denied* 506 U.S. 977 (1992); *Rise v. Oregon*, 59 F.3d 1556 (9th Cir. 1995), *cert. denied* 517 U.S. 1160 (1996); *Schlicher v. Peters*, 103 F.3d 940 (10th Cir. 1996); *Boling v. Romer*, 101 F.3d 1336 (10th Cir. 1996); and *Gaines v. State*, 116 Nev. 359, 998 P.2d 166, *cert. denied* 531 U.S. 856 (2000), without considering the special needs doctrine. Although we are not overruling the *Maass* decision, we are clarifying the constitutional analysis, including the application of the special needs doctrine.

Case law clearly establishes that the extraction and analysis of bodily fluids, such as blood, saliva, urine, and semen, are searches in the context of the Fourth Amendment to the United States Constitution. *Skinner v. Railway Labor Executives' Assn.*, 489 U.S. 602, 618, 103 L. Ed. 2d 639, 109 S. Ct. 1402 (1989) (blood and urine); *Schmerber v. California*, 384 U.S. 757, 767, 16 L. Ed. 2d 908, 86 S. Ct. 1826 (1966) (blood); *Schlicher*, 103 F.3d at 942-43 (blood and saliva); *Henry v. Ryan*, 775 F. Supp. 247, 253 (N.D. Ill. 1991) (saliva); *State v. Murry*, 271 Kan. 223, 226, 21 P.3d 528 (2001) (blood); *Crutchfield v. Hannigan* 21 Kan. App. 2d 693, 694-95, 906 P.2d 184 (1995) (urine); *State v. Williams*, 15 Kan. App. 2d 656, 667, 815 P.2d 569 (1991) (semen). The United States Supreme Court, however, has not yet addressed whether the collection of blood and saliva for a DNA database is constitutional.

The Fourth Amendment does not protect against all searches and seizures, only those that are unreasonable. Whether a search or seizure is reasonable depends on the circumstances surrounding the search or seizure. *Skinner*, 489 U.S. at 619. Generally, a search or seizure is unreasonable if it is not accompanied by individualized suspicion. *City of Indianapolis v. Edmond*, 531 U.S. 32, 37, 148 L. Ed. 2d 333, 121 S. Ct. 447 (2000). However, individualized suspicion is not an indispensable component of reasonableness. *Treasury Employees v. Von Raab*, 489 U.S. 656, 665, 103 L. Ed. 2d 685, 109 S. Ct. 1384 (1989).

The United States Supreme Court has recognized three exceptions to the general rule requiring individualized suspicion. *Edmond*, 531 U.S. at 37. When analyzing a search that lacks individ-

ualized suspicion, the first step in the constitutional analysis is to determine whether one of the three exceptions applies. See *Edmond*, 531 U.S. at 37-38; *Von Raab*, 489 U.S. at 665; *Skinner*, 489 U.S. at 619. If a case falls within one of the recognized exceptions, the next step in the analysis is to balance the need for the search with the invasion of the individual's rights. See *Von Raab*, 489 U.S. at 665; *Skinner*, 489 U.S. at 619; *United States v. Sczubelek*, 255 F. Supp. 2d 315, 320 (D. Del. 2003); *Miller v. United States Parole Comm'n*, 259 F. Supp. 2d 1166, 1177 (D. Kan. 2003). "Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Bell v. Wolfish*, 441 U.S. 520, 559, 60 L. Ed. 2d 447, 99 S. Ct. 1861 (1979).

The first exception to the rule requiring individualized suspicion recognizes the government's " 'special needs, beyond the normal need for law enforcement.' " *Edmond*, 531 U.S. at 37 (citing *Vernonia School Dist. 47J v. Acton*, 515 U.S. 646, 132 L. Ed. 2d 564, 115 S. Ct. 2386 [1995] [validating the random drug-testing of high school athletes]; *Von Raab*, 489 U.S. 656 [upholding the drug testing of United States Customs employees for transfer or promotion]; *Skinner*, 489 U.S. 602 [approving the drug and alcohol testing of railroad employees]); see also *Ferguson v. City of Charleston*, 532 U.S. 67, 149 L. Ed. 2d 205, 121 S. Ct. 1281 (2001) (invalidating a program for drug testing pregnant mothers); *Griffin v. Wisconsin*, 483 U.S. 868, 97 L. Ed. 2d 709, 107 S. Ct. 3164 (1987) (upholding the search of a probationer's home without probable cause). In determining whether a special need exists, a court must closely review the scheme at issue to determine its primary purpose. *Ferguson*, 532 U.S. at 81.

The United States Supreme Court has established several different categories of special needs. The *Griffin* Court concluded that the government's responsibility to supervise probationers is a special need allowing probation officers to search a probationer's private dwelling without probable cause. 483 U.S. at 875-76. Finding a similar responsibility for supervising schoolchildren to be a special need, the *Vernonia School Dist. 47J* Court upheld a program of drug testing high school athletes. 515 U.S. at 664-65. In

*Skinner*, the Supreme Court determined that the government's interest in regulating railroad employees to ensure safety is a special need and upheld a policy requiring railroad employees to submit to drug and alcohol screening. 489 U.S. at 620. The *Von Raab* Court found the government's substantial interest in deterring drug use and the promotion of drug users within the Customs Service to be a special need and validated a regulation requiring employees in certain positions to submit to drug testing. 489 U.S. at 666.

The second exception to the general rule requiring individualized suspicion involves limited administrative searches. *Edmond*, 531 U.S. at 37 (citing *New York v. Burger*, 482 U.S. 691, 96 L. Ed. 2d 601, 107 S. Ct. 2636 [1987] [upholding the administrative inspection of a closely regulated car-dismantling business]; *Michigan v. Tyler*, 436 U.S. 499, 56 L. Ed. 2d 486, 98 S. Ct. 1942 [1978] [validating the administrative inspection of fire-damaged building]; *Camara v. Municipal Court of City and County of San Francisco*, 387 U.S. 523, 18 L. Ed. 2d 930, 87 S. Ct. 1727 [1967] [approving an administrative inspection for compliance with city housing code]); see also *Wolfish*, 441 U.S. 520 (validating the strip search of inmates); *Pool v. McCune*, 267 Kan. 797, Syl. ¶ 7, 987 P.2d 1073 (1999) (upholding the use of plethysmograph testing for sex offenders).

The third exception to the rule requiring individualized suspicion involves motorist checkpoints. *Edmond*, 531 U.S. at 37 (invalidating a highway checkpoint for illegal narcotics); *Michigan Dept. of State Police v. Sitz*, 496 U.S. 444, 110 L. Ed. 2d 412, 110 S. Ct. 2481 (1990) (validating a sobriety checkpoint); *United States v. Martinez-Fuerte*, 428 U.S. 543, 49 L. Ed. 2d 1116, 96 S. Ct. 3074 (1976) (validating an illegal alien checkpoint). This exception clearly has no application to the facts of this case. However, it is interesting to note that although the *Edmond* Court recognized the checkpoint exception as a separate class, it blurred the line between the special needs exception and the checkpoint exception by invalidating a drug interdiction checkpoint because the government's primary purpose was crime control. 531 U.S. at 44.

Most of the courts that have reviewed the constitutionality of DNA collection and cataloging statutes have not categorized the analysis under one of the three exceptions to the general rule requiring individualized suspicion. Instead, these courts upheld the statutes by simply applying an interest balancing test. See, *e.g.*, *Jones*, 962 F.2d at 307-08; *Rise*, 59 F.3d at 1560-62; *Shaffer v. Saffle*, 148 F.3d 1180, 1181 (10th Cir.), *cert. denied* 525 U.S. 1005 (1998); *Schlicher*, 103 F.3d at 943 (upholding prior version of K.S.A. 21-2511); *Boling*, 101 F.3d at 1340; *Vanderlinden v. State of Kan.*, 874 F. Supp. 1210, 1214-15 (D. Kan. 1995) (upholding prior version of K.S.A. 21-2511); *Kruger v. Erickson*, 875 F. Supp. 583, 588-89 (D. Minn. 1995), *aff'd on other grounds* 77 F.3d 1071 (8th Cir. 1996); *Sanders v. Coman*, 864 F. Supp. 496, 499 (E.D. N.C. 1994); *Ryncarz v. Eikenberry*, 824 F. Supp. 1493, 1498-99 (E.D. Wash. 1993); *Matter of Appeal in Maricopa County*, 187 Ariz. 419, 423-24, 930 P.2d 496 (Ct. App. 1996); *People v. King*, 82 Cal. App. 4th 1363, 1376-77, 99 Cal. Rptr. 2d 220 (2000); *L. S. v. State*, 805 So. 2d 1004, 1007 (Fla. Dist. App. 2001); *People v. Calahan*, 272 Ill. App. 3d 293, 299-300, 649 N.E.2d 588 (1995); *People v. Wealer*, 264 Ill. App. 3d 6, 14-17, 636 N.E.2d 1129 (1994); *Landry v. Attorney General*, 429 Mass. 336, 343-47, 709 N.E.2d 1085 (1999), *cert. denied* 528 U.S. 1073 (2000); *Cooper v. Gammon*, 943 S.W.2d 699, 704-05 (Mo. App. 1997); *Gaines*, 116 Nev. at 369; *State ex rel Juv. Dept. v. Orozco*, 129 Or. App. 148, 152-54, 878 P.2d 432 (1994); *Johnson v. Commonwealth*, 259 Va. 654, 672, 529 S.E.2d 769, *cert. denied* 531 U.S. 981 (2000); *Doles v. State*, 994 P.2d 315, 318-19 (Wyo. 1999). Our opinion in *Maass* follows the same approach. See 275 Kan. at 337.

Although DNA collection and cataloging statutes do not fall within the special needs analysis previously articulated by the United States Supreme Court, some courts have reviewed DNA statues using the special needs exception. Those cases include *Roe v. Marcotte*, 193 F.3d 72, 79-82 (2d Cir. 1999); *United States v. Kimler*, 335 F.3d 1132 (10th Cir. 2003); *United States v. Miles*, 228 F. Supp. 2d 1130 (E.D. Cal. 2002) (overturning the statute by refusing to find a special need beyond normal law enforcement); *United States v. Reynard*, 220 F. Supp. 2d 1142, 1165-69 (S. D.

Cal. 2002); *Sczublelek*, 255 F. Supp. 2d at 320-23; *Miller*, 259 F. Supp. 2d at 1175-78 (upholding a federal DNA collection statute); *Nicholas v. Goord*, 2003 WL 256774 (S.D.N.Y. Feb. 6, 2003) (unpublished opinion); *Shelter v. Gudmanson*, 934 F. Supp. 1048, 1050-51 (W.D. Wis. 1996) (assuming a special need without analysis); *Dial v. Vaughn*, 733 A.2d 1, 6-7 (Pa. Commw. 1999) (assuming that the special needs exception applies without analyzing the purpose of the statute); and *State v. Olivas*, 122 Wash. 2d 73, 92, 856 P.2d 1076 (1993). Some of these courts did not specifically analyze the special need involved. However, other courts concluded that the government's interest in solving past and future crimes and in deterring individuals from committing future offenses is a special need. *Marcotte*, 193 F.3d at 79; *Reynard*, 220 F. Supp. 2d at 1168; *Sczubelek*, 255 F. Supp. 2d at 323; *Miller*, 259 F. Supp. 2d at 1176; *Nicholas*, 2003 WL 256774 at 12; *Olivas*, 122 Wash. 2d at 92-93. This special need for DNA collection and cataloging statutes is distinguished from the "normal" need for law enforcement because the DNA samples prove "nothing by themselves regarding whether a donor has committed a crime" and, therefore, does not detect ordinary criminal wrongdoing. *Nicholas*, 2003 WL 256774 at 13.

This distinction is significant in light of the United States Supreme Court's decisions in *Ferguson* and *Edmond*. In *Ferguson*, the Court determined that the immediate objective for drug testing certain pregnant mothers was to "generate evidence for *law enforcement purposes*" rather than to treat drug addicted mothers and babies. 532 U.S. at 82-83. Finding that the immediate objective was not a special need beyond the normal need for law enforcement, the *Ferguson* court struck down a municipal hospital's policy ordering that nonconsensual drug screens be performed on maternity patients who were suspected of using cocaine. 532 U.S. at 84, 86.

Likewise, in *Edmond*, 531 U.S. at 41-42, the Court concluded that the primary purpose for a narcotics checkpoint was to detect ordinary criminal wrongdoing and prosecute the offenders. Because the primary purpose was not beyond the normal need for

law enforcement, the Court invalidated the checkpoint program. 531 U.S. at 41-42.

The *Miles* court also considered the special needs doctrine when it analyzed a statute authorizing the collection and cataloging of DNA and determined that the government did not have a special need beyond the normal need for law enforcement. 228 F. Supp. 2d at 1139. Relying on *Edmond* and *Ferguson*, the *Miles* court invalidated a federal statute requiring a former felon to provide a DNA sample. 228 F. Supp. 2d at 1138-40. The *Miles* court distinguished case law upholding DNA statutes on the basis that they were either decided before *Edmond* and *Ferguson* or did not discuss the import of those decisions. 228 F. Supp. 2d at 1140.

This court has a duty to uphold a statute under constitutional attack if there is any reasonable way to construe the statute as constitutionally valid. *State v. Engles*, 270 Kan. 530, 531, 17 P.3d 355 (2001). The United States Supreme Court has routinely validated the collection and analysis of bodily fluids as long as there was a special need beyond detecting criminal wrongdoing. See, *e.g.*, *Vernonia School Dist. 47J*, 515 U.S. at 653; *Von Raab*, 489 U.S. at 666; *Skinner*, 489 U.S. at 620-21; *Griffin*, 483 U.S. 868. Here, the State has a special need for accurately solving future crimes and, thereby, protecting the safety and welfare of Kansas citizens. This special need is beyond the *normal* need for law enforcement because it does not in and of itself detect criminal wrongdoing.

We disagree with the *Miles* court's analysis of *Edmonds* and *Ferguson*. In determining that DNA collection was not beyond the normal need for law enforcement, the *Miles* court failed to consider the key distinction between DNA information and drug testing and checkpoint inspections. The key distinction is that the drug testing and the checkpoint inspections provide evidence of current or ongoing criminal wrongdoing. Based on the evidence obtained from the drug test and the checkpoint inspections, officers have probable cause to immediately arrest someone for a current or ongoing crime. With DNA information, however, there is no immediate possibility of finding probable cause to support an arrest. Like fingerprint and photograph identification information, the DNA information does not, in and of itself, detect or implicate any criminal

wrongdoing. It is this distinction that removes the collection and cataloging of DNA information from the normal need for law enforcement. With this distinction in mind, we agree with the courts that have found the collection and cataloging of DNA information to be a special need beyond the normal need for law enforcement.

Having met the threshold requirement of establishing a special need as an exception to the general rule requiring individualized suspicion, we must balance the individual's rights against the State's legitimate interests by considering the scope of the intrusion, the manner in which the testing is conducted, the reason for the testing, and the place where the testing is conducted. See *Wolfish*, 441 U.S. at 559.

K.S.A. 2001 Supp. 21-2511(a) provides for the collection and testing of a person's blood and saliva. The United States Supreme Court has previously determined that blood testing is commonplace and constitutes a minimal intrusion with virtually no risk. *Skinner*, 489 U.S. at 625; *Schmerber*, 384 U.S. at 771. Saliva sampling is even less intrusive than blood sampling. *Nicholas*, 2003 WL 256774 at 16. K.S.A. 2001 Supp. 21-2511(e) further requires that all of the blood sampling must be performed by qualified medical professionals in accordance with generally accepted medical practices. Although the statute does not specifically designate where the samples may be taken, it limits the available collection sites to those that comply with accepted medical practices, thereby minimizing the risk of infection. K.S.A. 2001 Supp. 21-2511(c), (e). This method of collecting blood samples complies with the blood sampling approved by the United States Supreme Court in *Schmerber*, 384 U.S. at 771-72.

In balancing the reasons for the DNA testing, it is important to note that convicted felons, such as those specifically included in K.S.A. 2001 Supp. 21-2511(a), are routinely fingerprinted and photographed for identification purposes. K.S.A. 2001 Supp. 21-2511(b). Indeed, "it is elementary that a person in lawful custody may be required to submit to photographing [citation omitted] and fingerprinting [citation omitted] as part of routine identification processes. [Citation omitted.]" *Smith v. United States*, 324 F.2d 879, 882 (D.C. Cir. 1963). Other courts upholding DNA sampling

and cataloging have also compared the process to fingerprinting and photographing persons legally in custody. See, *e.g., Jones v. Murray*, 962 F.2d 302, 306 (4th Cir. 1992); *Rise v. Oregon*, 59 F.3d 1556, 1560 (9th Cir. 1995), *cert. denied* 517 U.S. 1160 (1996) (stating: "That the gathering of DNA information requires the drawing of blood rather than inking and rolling a person's fingertips does not elevate the intrusion upon the [person's] Fourth Amendment interests to a level beyond minimal."); *Boling v. Romer*, 101 F.3d 1336, 1339 (10th Cir. 1996); *Landry*, 429 Mass. at 347.

It is also significant that convicted criminals have a reduced expectation of privacy. Finding that a probationer's liberty is limited by the observance of special restrictions, the United States Supreme Court in *Griffin* upheld the search of a probationer's residence without probable cause by distinguishing between a probationer's expectation of privacy in his home and the general public's expectation of privacy in their homes. 483 U.S. at 874-75. Likewise, we recognized an inmate's limited expectation of privacy in his body when we upheld plethysmograph testing of sex offenders in a sexual abuse treatment program. *Pool*, 267 Kan. at 802-03.

Moreover, a person convicted of a crime has a reduced expectation of privacy in his or her identity. *Jones*, 962 F. 2d at 306; *Rise*, 59 F.3d at 1560. "Once a person is convicted of one of the felonies included as a predicate offense . . ., his identity has become a matter of state interest and he has lost any legitimate expectation of privacy in the identifying information derived from blood sampling." *Rise*, 59 F.3d at 1560.

The United States Supreme Court has recognized that dispensing with the warrant requirement may be necessary when it frustrates the government's purpose for the search. *Skinner*, 489 U.S. at 623. That principle applies in this case. The government cannot establish probable cause to collect DNA information when there is no indication that a crime has even been committed. The essential purpose for a warrant is "to protect privacy interests by assuring citizens subject to a search or seizure that such intrusions are not the random or arbitrary acts of government agents." *Skinner*, 489 U.S. at 621-22. Here, State authorities are not allowed to choose which offenders will provide samples but are directed by the stat-

ute to collect and catalog samples from all persons convicted of the listed crimes. K.S.A. 2001 Supp. 21-2511. There is nothing random or arbitrary about the State's action in collecting DNA samples pursuant to K.S.A. 2001 Supp. 21-2511. Thus, a warrant is unnecessary to protect citizens from random or arbitrary DNA collection under the statute. See *Skinner*, 489 U.S. at 622.

The State's justification for DNA testing is accurately solving future crimes to protect Kansas citizens from dangerous criminals. Weighing this substantial State interest against a convicted person's right to privacy, the balance must tip in favor of the State's substantial interest. The collection and cataloging of DNA information pursuant to K.S.A. 2001 Supp. 21-2511 does not violate the Fourth Amendment's protection against unreasonable searches and seizures.

Martinez attempts to distinguish his case from others by pointing to the recent addition of burglary as one of the crimes set forth in the statute. He argues that DNA evidence is not likely to be used for solving future burglary crimes because the leaving of DNA is so incidental and the chances of police finding such DNA is so remote that there is no legitimate nexus between the two. This argument is without merit.

In *Bousman v. Dist. Ct. for Clinton County*, 630 N.W.2d 789, 801 (Iowa 2001), the Iowa Supreme Court held that the State must have probable cause before issuing an order requiring a *suspect* to submit DNA samples. (The holding does not address the application of a DNA collection and cataloging statute.) The case involved the investigation of a burglary that was accomplished by breaking a window. The burglar left drops of blood at the crime scene. Although not relevant to the constitutional analysis in this case, the *Bousman* case clearly identifies a situation in which DNA evidence may be used to determine who committed a burglary. It also highlights the potential for finding DNA evidence at burglary crime scenes by demonstrating that entry may be achieved through excessive force or breaking windows. Anytime there is excessive force or broken glass, there is the potential for injury and resulting blood evidence.

Martinez' argument is further diminished by the fact that other courts have upheld DNA collection and cataloging statutes that include burglary. See, *e.g.*, *Jones*, 962 F.2d at 303-04 (applying a Virginia statute that included all convicted felons); *Shaffer v. Saffle*, 148 F.3d 1180, 1181 (10th Cir. 1998) (upholding Oklahoma statute requiring DNA samples from persons convicted of burglary); *Nicholas*, 2003 WL 256774 at 1 (applying a New York statute that included burglary); *L.S.*, 805 So. 2d at 1005 (upholding the Florida DNA statute as it applied to a juvenile that plead no contest to burglary); *Landry*, 429 Mass. at 338 (including burglary); *Gaines*, 116 Nev. at 370-71 (upholding a Nevada DNA statute as it applied to a person convicted of burglary); *Doles*, 994 P.2d at 317 (including every person convicted of a felony). The addition of burglary to the crimes included in K.S.A. 2001 Supp. 21-2511 does not make the statute unconstitutional.

Affirmed.

ABBOTT, J. not participating.

LARSON, S.J., assigned